UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS UNION AND PARTICIPATING FOOD INDUSTRY EMPLOYERS TRI-STATE PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | No. |
| Plaintiff, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| BANCO BILBAO VIZCAYA ARGENTARIA S.A.; BANCO SANTANDER S.A.; BANK OF AMERICA CORP.; BARCLAYS PLC; CITIGROUP INC., CREDIT SUISSE AG, DEUTSCHE BANK AG; HSBC HOLDINGS PLC; and JPMORGAN CHASE & CO., | |
| Defendants. | |

Plaintiff United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund ("Plaintiff" or "UFCW Tri-State") alleges upon knowledge as to each of its own actions and upon information and belief as to all other matters, against Defendants (as defined below) as follows:

UFCW Tri-State brings this action under Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1, and Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§15(a) and 26, on behalf of itself and other similarly situated American individuals and entities (collectively, "investors") that purchased or sold marketable debt securities issued by the Mexican government (collectively, "Mexican Government Bonds" or "MGBs") from the Defendants during the period beginning at least by October 28, 2006 and continuing through April 18, 2017

(the "Class Period").  As alleged herein, Plaintiff and the proposed Class were harmed by paying artificially high prices for newly issued MGBs due to Defendants' collusive raising and fixing of the prices of those MGBs, and by paying artificially high purchase prices and receiving artificially low sale prices in the secondary market for MGBs as a result of Defendants' collusive widening of bid-ask spreads.

## NATURE OF THE ACTION

1.     MGBs are debt instruments of varying description that are issued by the Mexican government.

2.     There are about $270 billion in MGBs outstanding, a significant fraction of which are owned by American investors.

3.     Defendants are multinational banks and their subsidiaries and affiliates who trade MGBs with customers in the United States.  The Mexican government sells newly issued MGBs at auctions at which the Defendants are the only entities permitted by the Mexican government to bid.  Defendants purchase MGBs at auction, and then sell those MGBs to investors, including many investors in the United States.  Defendants also operate as market makers in the secondary market for MGBs, offering trading of MGBs to investors in the U.S. and elsewhere based on quoted bid-ask spreads.

4.     Defendants have taken advantage of their exclusive position, both in the primary auction market and in the secondary market as market makers, by colluding in the following ways: (1) colluding to offer artificially low bids to the Mexican government for newly issued MGBs; (2) colluding to sell the newly issued MGBs they purchase at auction at artificially high prices to buyers in the secondary market; and (3) colluding to artificially widen bid-ask spreads for MGBs in the secondary market.

5.      The subjects of this Complaint are: (1) Defendants' collusive sales of newly issued MGBs at artificially higher prices to American investors; and (2) Defendants' collusive widening of bid-ask spreads for secondary market trading of MGBs involving American investors.  Plaintiff asserts a class of American individuals and entities who purchased MGBs directly from, or sold MGBs directly to, the Defendants during the Class Period.

6.      In April 2017, Mexican antitrust regulator Comisión Federal de Competencia Económica ("COFECE") announced that it was investigating anticompetitive conduct among the Defendants in the MGB market.

7.      In August 2017, Mexican securities regulator Comisión Nacional Bancaría y de Valores ("CNBV") announced that it had launched its own investigation into anticompetitive conduct among the Defendants in the MGB market.

8.      By and through their unlawful conspiracy, Defendants intended to, and did, raise prices of newly issued MGBs that they resold to American investors, and intended to, and did, widen bid-ask spreads for MGBs in secondary market trading with American investors, earning billions of dollars more profits than they otherwise would have in a competitive market, at the expense of unwitting investors such as Plaintiff and members of the proposed Class.

9.      Plaintiff's economic injuries flowed directly from Defendants' collusive and anticompetitive manipulation of the secondary market for MGBs, and Defendants were fully aware of the foreseeable consequences of their collusive, manipulative, and anticompetitive conduct.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action under 28 U.S.C. §§1331 and 1337(a), and pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26.

11.    Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15(a), 22, and 26, and 28 U.S.C. §1391(b), (c), and (d).  One or more of the Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events giving rise to Plaintiff's claims arose in the District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

12.    Each Defendant is subject to personal jurisdiction because each transacted business throughout the United States, including in this District, including by transacting in MGBs with Plaintiff and members of the Class throughout the United States and in this District.

13.    Defendants' activities were within the flow of, were intended to have a substantial effect on, and did in fact have a substantial effect on, American interstate commerce. During the Class Period, Defendants used the instrumentalities of American interstate commerce, including interstate wires, in furtherance of their illegal conspiracy.

14.    Defendants' collusive, manipulative, and anticompetitive conduct alleged herein had direct, substantial, and reasonably foreseeable effects on American domestic commerce, and such effects give rise to Plaintiff's claims.

## THE PARTIES

### A.    Plaintiff

15.    Plaintiff United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund is headquartered in Plymouth Meeting, Pennsylvania.  Established in 1958, it is a Taft-Hartley, multi-employer defined benefit pension trust fund.  UFCW Tri-State provides retirement benefits to present and former unionized employees of numerous food and service employers, including Acme Markets, Shop Rite, and others.  As of December 31, 2016, UFCW Tri-State managed more than approximately $400,000,000 in net assets on behalf of more than 33,000 plan participants.  During the Class Period, UFCW Tri-State bought MGBs from multiple Defendants, including BBVA, Banco Santander, Bank of America, Barclays, Deutsche Bank, HSBC, and JPMorgan.

### B.    Defendants

16.    Banco Bilbao Vizcaya Argentaria S.A. ("BBVA") is a multinational financial services company with its headquarters in Bilbao, Spain.  BBVA owns and operates a branch office in New York, New York, from which it marketed and sold MGBs to U.S.-based investors during the Class Period.  BBVA's subsidiary, BBVA Securities, Inc., also marketed and sold MGBs to U.S.-based investors during the Class Period.

17.    Defendant Banco Santander S.A. ("Banco Santander") is a multinational financial services company with its headquarters in Santander, Spain.  Banco Santander owns and operates a branch office in New York, New York, from which it marketed and sold MGBs to U.S.-based investors during the Class Period.  Banco Santander's subsidiaries, Santander Investment Securities and Santander Investment Bolsa, Sociedad de Valores, S.A., also marketed and sold MGBs to U.S.-based investors during the Class Period.

18.     Defendant Bank of America Corp. ("Bank of America") is a multinational financial services company with its headquarters in Charlotte, North Carolina.   Bank of America's New York, New York-based subsidiary, Merrill Lynch, Pierce, Fenner & Smith Incorporated, is the successor company of Bank of America Securities, which marketed and sold MGBs to U.S.-based investors during the Class Period.

19.     Defendant Barclays PLC ("Barclays") is a multinational financial services company with its headquarters in London, England.   Barclays' New York, New York-based subsidiary, Barclays Capital Inc., marketed and sold MGBs to U.S.-based investors during the Class Period.

20.     Defendant Citigroup Inc. ("Citigroup") is a multinational financial services company with its headquarters in New York, New York.   Citigroup's New York, New York-based subsidiary, Citigroup Global Markets, Inc. and its subsidiary Banco Nacional de Mexico, S.A., marketed and sold MGBs to U.S.-based investors during the Class Period.

21.     Defendant Credit Suisse AG ("Credit Suisse") is a multinational financial services company with its headquarters in Zurich, Switzerland.   Credit Suisse's New York, New York-based subsidiaries, Credit Suisse (USA) Inc. and Credit Suisse AG, New York branch, marketed and sold MGBs to U.S.-based investors during the Class Period.

22.     Defendant Deutsche Bank AG ("Deutsche Bank") is a multinational financial services company with its headquarters in Frankfurt, Germany.   Deutsche Bank owns and operates a branch office in New York, New York that marketed and sold MGBs to U.S.-based investors during the Class Period.   Deutsche Bank's New York, New York-based subsidiary, Deutsche Bank Securities Inc., also marketed and sold MGBs to U.S.-based investors during the Class Period.

23.     Defendant HSBC Holdings PLC ("HSBC") is a multinational financial services company with its headquarters in London, England.  HSBC's New York, New York-based subsidiaries, HSBC Securities (USA) Inc. and HSBC North America Holdings Inc., marketed and sold MGBs to U.S.-based investors during the Class Period.

24.     Defendant JPMorgan Chase & Co. ("JPMorgan") is a multinational financial services company with its headquarters in New York, New York.  JPMorgan's New York, New York-based subsidiaries, JP Morgan Securities LLC and JPMorgan Chase Bank, N.A., marketed and sold MGBs to U.S.-based investors during the Class Period.

## FACTUAL ALLEGATIONS

**A.     Defendants Marketed MGBs to, and Transacted in, MGBs with Investors in the United States**

25.     During the Class Period, the Defendants marketed MGBs to investors in the United States by citing their investment-grade rating, relative liquidity, Mexico's close economic ties with the United States, and yields that were considerably higher than comparable U.S. Treasury bonds.

26.     The Defendants did not disclose to those investors that they were engaged in a conspiracy to inflate the prices of newly issued MGBs that they had purchased at auction from the Mexican government, or that they had also engaged in a conspiracy to widen bid-ask spreads, both of which were pieces of information that reasonable investors would consider important in making their decisions on whether to buy newly issued MGBs from the Defendants or otherwise trade MGBs with them.

27.     The Defendants' purposeful use of the U.S. market allowed them to sell hundreds of billions of dollars in newly issued MGBs to American investors and investors in this District, and to trade hundreds of billions of dollars in MGBs in the secondary market with American

investors and investors in this District, providing them with billions of dollars in profits that they would not have received if not for their conspiracy.

28.     Each of the Defendants, through its New York branch office and/or through its subsidiaries, pursued a campaign to market and sell MGBs to American investors.  This included promotional literature and employees assigned to market MGBs to investors in the United States.

29.     Defendants' campaign to create an American market for MGBs and MGB trading was successful.  Foreign investment in Mexican government debt reached new high levels according to the Institute of International Finance, and much of that was American investment. In many categories of MGBs, investors outside of Mexico held a majority of MGBs in that category.

30.     As of April 2017, non-Mexican investors held over $100 billion in MGBs.  In the MGB category Bonos (long-term, fixed-rate bonds), as of June 2016, non-Mexican investors held about 60% of all outstanding Bonos.

31.     As mentioned above, Defendants used their New York branches and/or their subsidiaries to sell newly issued MGBs to American investors and to transact in MGBs with American investors.  Defendants were aware of these sales and transactions, supervised them, directed them, and benefitted from them.

32.     Defendants' New York branches and subsidiaries transacted MGBs at collusive, artificially wide bid-ask spreads with investors in the United States, including in transactions with Plaintiff.  Defendants were aware of this conduct, supervised it, directed it, and benefitted from it.

**B.    Defendants Have Been Investigated for Collusive Activity in Other Financial Markets, in Which Investigations Many of Them Pleaded Guilty and Agreed to Settlements**

33.    Defendants herein have been the subject of previous investigations of anticompetitive actions including market manipulation, collusion, and price fixing in the financial markets, including investigations relating to the foreign exchange and SSA bond[1] markets and the reference rates Libor, Euribor, and ISDAfix.[2]

34.    In June 2012, Defendant Barclays agreed to pay a $453 million settlement for its role in manipulating LIBOR.

35.    In April 2015, Defendant Deutsche Bank pleaded guilty for its role in manipulating LIBOR and was fined over $2.5 billion by American and British regulators.

36.    In May 2015, Defendants Barclays, Citigroup, and JPMorgan pleaded guilty to felony charges for manipulating the foreign exchange market, and paid fines of over $2.5 billion.

37.    In December 2015, the DOJ launched an investigation of many of the Defendants herein for manipulating, and colluding to fix prices in, the SSA bond market.

38.    In May 2016, Defendants Bank of America, Barclays, Citigroup, Credit Suisse, Deutsche Bank, and JPMorgan (in addition to Royal Bank of Scotland, which is not a Defendant here) paid over $300 million to settle a class action alleging that they rigged the ISDAfix reference rate.  Defendant HSBC also agreed to a settlement at a later date.

---

[1]    Supranational, sub-sovereign, and agency bonds.

[2]    The International Swaps and Derivatives Association fixed interest rate.

39.    In December 2016, the European Union fined Defendants HSBC and JPMorgan (in addition to Crédit Agricole, which is not a Defendant here) nearly €500 million for rigging the Euribor reference rate.

**C.    The Mexican Government Bond Market**

40.    The Mexican government issues MGBs in auctions in which the Defendants are the only entities permitted to bid on the newly issued MGBs.  Anyone else seeking to purchase MGBs is not allowed to participate in the auctions and must buy them from Defendants or buy them in the secondary market (in which the Defendants are the main market makers).

41.    Categories of MGBs include Cetes (zero coupon bonds with maturities between 28 days and one year), Bonos (fixed-rate coupon bonds with maturities from three years to 30 years), Udibonos (fixed-rate coupon bonds with maturities from three years to 30 years that are hedged against the Mexican consumer price index to protect against inflation), and Bondes D (variable-rate bonds whose interest rate is Mexico's overnight interbank funding rate, and that normally have maturities from one to seven years).

42.    The Defendants participate in the auctions by each submitting sealed bids listing the quantities of MGBs they are willing to buy and at what price.  For Cetes and Bondes D, the Mexican government uses a multi-price auction in which it sorts the bids for each issue of bond from highest to lowest, and then accepts bids in descending order until all of the bonds in that issue are sold.  For Bonos and Udibonos, the Mexican government uses a single-price auction in which, after it sorts the bids from highest to lowest, the price that would be needed to sell the last bond in the issue becomes the price for all of the sales in that issue.

43.    For example, if there are 23 Bondes D for sale, and the bids are for 10 at 95,000 pesos, 10 at 94,000 pesos, 10 at 93,000 pesos, 10 at 92,000 pesos, and 10 at 91,000 pesos, 10 of them would be sold at 95,000 pesos, 10 at 94,000 pesos, and three at 93,000 pesos.

44.    However, if those were Bonos, since the price needed to sell the last bond in the auction would be 93,000 pesos, that would become the price of all of the Bonos.

**D.    Defendants Participate or Participated in the Bank of Mexico's Market Makers Program**

45.    Defendants BBVA, Banco Santander, Bank of America, Barclays, Citigroup, Deutsche Bank, HSBC, and JPMorgan are the current participants in the Bank of Mexico's Market Makers Program.

46.    Banks that formerly participated in the Market Makers Program at earlier times during the Class Period are Defendants Credit Suisse, Chase Manhattan (now part of JPMorgan), Citibank (now part of Citigroup), and Merrill Lynch (now part of Bank of America).

47.    Under the Market Makers Program, participating market makers are required to: (1) submit bids for at least a certain percentage of each issue of MGBs, which guarantees that Defendants collectively submit bids for all MGBs issued in any given auction; and (2) act as market makers in the secondary market and trade MGBs to the public based on bid-ask quotes, which increases the liquidity of MGBs and makes them more attractive to investors.

48.    Market makers earn profits in two ways: (1) purchasing newly issued MGBs at auctions and then selling them to buyers at a higher price; and (2) in secondary trading markets, buying MGBs at the lower "bid" price and selling them for the higher "ask" price.

49.    MGB transactions are almost all conducted on an OTC basis, and usually by telephone.  An investor seeking to purchase or sell MGBs has to call or email a designated employee of a Defendant bank, who will provide that investor with a bid-ask quote.

50.    Defendants are the only authorized market makers for MGBs, which gives them near-total control of the MGB market.  Defendants controlled 82% of the MGB market during the Class Period.  If trades between Defendants and trades involving the Mexican Finance Ministry are excluded, Defendants' market share was over 85%.

### E.    Mexican Government Investigations into Defendants' Collusive Activity

51.    On April 19, 2017, COFECE stated that it had found evidence of price-fixing and collusion in the MGB market.  In response to a subsequent request from the Mexican parliament, COFECE stated that Defendants' conduct constituted monopolistic practices under Mexican law, and that it was investigating the financial brokers for evidence of "agreements, arrangements, or combinations of economic agents that are competitors involved, whose purpose or effect is the manipulation of prices, restriction or limitation of the offer or the demand, division, and segmentation of markets, the agreement or coordination of positions in tenders, just as in the exchange of information with the object or effect of accomplishing the above conduct."[3]

52.    COFECE stated that Defendants' collusion to submit artificially low bids at MGB auctions damaged the Mexican government, which had to pay higher interest on its debt as a result.

53.    COFECE also stated that the investigation covered both the primary bond market (collusion at auctions) and the secondary market (collusive sales to and trading with investors).

54.    By May 2017, COFECE had disclosed that it was investigating Defendants BBVA, Banco Santander, Bank of America, Barclays, Citigroup, HSBC, and JPMorgan.  Each bank has acknowledged that it is the subject of a COFECE investigation.

---

[3]    http://www.jornada.unam.mx/2017/04/20/economia/025n1eco (translated) (last visited May 17, 2018).

55.     In COFECE's response to the request from the Mexican parliament, it stated that one bank had been given immunity in return for providing information useful to the investigation.  Since the other seven market makers have all been announced as under investigation, it is therefore likely that institution is Deutsche Bank.  Under Mexican law, an institution cannot receive immunity without a direct admission of criminal activity.

56.     COFECE's investigation dates back to at least October 28, 2006.

57.     In July 2017, the CNBV announced that it would also investigate collusion in the MGB market.

58.     Given that all current market makers have been implicated in the conspiracy, it is therefore plausible that Credit Suisse participated in the conspiracy at the time at which it was part of the Market Makers Program.

59.     The COFECE and CNBV investigations are ongoing.

**F.    Economic Analysis Is Evidence of Defendants' Collusive Behavior**

60.     In primary auctions, if all participants are independent, there is likely to be significant variation among their bids.  If the participants collude, their bids will likely be very similar.  Therefore, an analysis of the "bid dispersion," the difference between the highest price bid and the lowest bid price that actually received a bond, is a good indicator of the existence or absence of collusion.  With respect to Cetes and Bondes D, colluders would want to keep their high bids as low as possible in order to avoid paying any extra for the bonds.

61.     An economic analysis showed that the average bid dispersion from January 2006 to April 18, 2017 (the day before the COFECE investigation was announced) was 0.49 pesos for Bonos and 0.07% for Cetes.  However, from April 19, 2017 through November 28, 2017, that average bid dispersion increased to 0.55 pesos for Bonos and 0.10% for Cetes, an increase of

12% and 43%, respectively.  The increase was much higher for Cetes than for Bonos, and most pronounced for the shortest-term Cetes, increasing 50% for three-month Cetes and 70% for one-month Cetes.  Since Cetes use a multiple price auction, there is an effective penalty for high bids, unlike Bonos' single price auction, in which bids higher than the settling price are not treated differently whether they are 1% higher or 100% higher.  This penalty for high bids for Cetes creates much greater benefits to colluders from working together to limit each of their high bids.  The substantially higher bid dispersion in the later period, and particularly for Cetes, likely indicates that the banks were colluding in the prior period to offer artificially low prices and similar bids, and that the collusion stopped or lessened after the investigation was announced.

62.    The analysis of bid dispersion was also conducted to adjust for market conditions.  In order to account for volatility in the broader financial world, the bid dispersion results for 10-year Bonos were adjusted by the 10-year U.S. Treasury Note Volatility Index, for the following reasons: (1) bid-ask spreads would normally be higher in a more volatile market, even in the absence of collusion; (2) American treasury bonds' volatility is a good indicator of the volatility of the global bond market, and therefore this adjustment would account for global events and market trends such as the 2008 financial crisis; and (3) American treasury bonds' yields are highly correlated with those of MGBs, and so factors in the economy that move American treasury bonds would also tend to move MGBs similarly in a non-collusive market. The bid dispersion for 10-year Bonos increased 13% from the January 2006 to April 18, 2017 period to the April 19, 2017 through November 28, 2017 period.  However, after adjusting for American treasury bonds' volatility, the increase in bid dispersion was 36%.  This shows that

the difference in bid dispersion after the COFECE announcement cannot be explained by events and trends that differed between the two periods.

63.    An economic analysis of median bid dispersion of Bondes D shows an even stronger effect of collusion in terms of bids before and after the COFECE investigation was announced.  An economic analysis showed that the median bid dispersion from September 19, 2016 through April 18, 2017 (the day before the COFECE investigation was announced) was 0.0004 for one-year Bondes D, 0 for three-year Bondes D, and 0.0001 for five-year Bondes D. However, from April 19, 2017 through November 28, 2017, it was 0.0019 for one-year Bondes D, 0.0026 for three-year Bondes D, and 0.0034 for five-year Bondes D.  Bondes D have a multiple price auction like Cetes, and therefore there is a penalty for high bids, and a clear benefit to colluders from working together to limit their high bids.  The substantially higher bid dispersion in the later period, and the fact that the bid dispersion was extremely low in the prior period, likely indicates that the banks were colluding in the prior period to offer artificially low prices, and that the collusion stopped or lessened after the investigation was announced.



64.    Economic analysis also found that bid dispersion in the Cetes and Bonos markets also increased significantly after the COFECE investigation was announced.

65.    Also, an economic analysis of the number of bonds for which bidders bid at the Bondes D auctions found that the Defendants bid for significantly more bonds in the period from September 19, 2016 through April 18, 2017 than in the period April 19, 2017 through November 28, 2017.   The "bid-to-cover ratio" is the ratio of (number of bids received) to (number of bids accepted).   For example, if there is an auction of 100 Bondes D with a three-year maturity and a face value of 10,000 pesos, and the total number of bids for those bonds is 400, the bid-to-cover ratio would be 400/100 = 4.   Colluding bidders are likely to bid for more bonds, because: (1) they know the end results of the auction and so they can determine exactly how many bonds they want at that price; and (2) the collusively priced bonds would tend to be very favorable investments to them, and therefore they would buy more bonds at that price than at a competitive price.    Non-colluding bidders are likely to bid for fewer bonds, because: (1) without knowing the end result of the auction, they are likely to be more cautious in their bids rather than risk acquiring a large number of bonds at an unfavorable price; and (2) the bonds at a competitive price would not be extremely attractive as compared to other possible investments, unlike bonds with a collusively low price.   The median bid-to-cover ratio for Bondes D in the September 19, 2016 through April 18, 2017 period was 8.73 for the one-year, 9.60 for the three-year, and 9.41 for the five-year, while in the period from April 19, 2017 through November 28, 2017, it was 3.87 for the one-year, 8.67 for the three-year, and 6.54 for the five-year.   This shows that the number of bonds requested declined significantly after the COFECE investigation was announced.   This likely indicates that the banks were colluding in the prior period and bid for far more bonds under collusive conditions that were more favorable

to them, and after the investigation was announced, the collusion stopped or lessened, and they bid for fewer bonds under less favorable competitive or mostly competitive conditions.



66.     Similarly, an economic analysis of the difference in price between what Defendants paid at auction for a given MGB and the price of that MGB in the secondary market also indicates collusion.

67.     In the absence of collusion, the fair value of any MGB would likely be very similar at the auction and in the secondary trading market, other than some small charge for transaction cost or a reasonable bid-ask spread.  If the banks collude, they would: (1) pay the Mexican government an artificially low price for MGBs at the auction; and then (2) turn around and charge an artificially high price for those same MGBs in the secondary market.  Therefore, if the secondary market price is greater than the auction price by a significant amount that would indicate collusion.

68.     An economic analysis of auction prices and secondary market prices of Bonos and Udibonos confirmed that before April 18, 2017, all maturities of Bonos and Udibonos had a higher price in the secondary market as compared to the auction.  After April 19, 2017, seven

out of eight categories of Bonos and Udibonos experienced a decline in that price difference, and three out of eight categories actually had a negative price difference – a lower price in the secondary market as compared to the auction.  This indicates that collusion existed before April 19, 2017, and either stopped or lessened after the COFECE investigation was announced.

69.    Similarly, an economic analysis of bid-ask spreads in the secondary market also indicates collusion.

70.    In the absence of collusion, competition between banks would reduce bid-ask spreads because any individual bank could not charge too wide a spread without losing customers to other banks.  Individuals can easily call multiple banks to get quotes or use electronic means to get quotes, and then select the best offer.  For example, if Deutsche Bank's bid-ask price for a certain 10-year Bono is to buy them at 92.35 and sell them at 92.45, Credit Suisse could offer to buy them at 92.36 and sell them at 92.44 and get almost all of Deutsche Bank's business unless Deutsche Bank matched or beat Credit Suisse's prices.  Open competition between many banks would reduce bid-ask spreads to a low level.

71.    When the period from 2011 through April 2017 is compared to the period from April 19, 2017 through April 2018, the median bid-ask spread for all maturities of Bonos and Udibonos declined from the first period to the second period, significantly in most cases.  This indicates that collusion between banks existed before April 19, 2017 and stopped or lessened after the COFECE investigation was announced.

72.    An analysis of bid-ask spreads over the broader period January 2006 to April 18, 2017, as compared to the period from April 19, 2017 through November 28, 2017, found similar results.  Bid-ask spreads were lower for all maturities of Bonos and Cetes studied (data was only available for six-month and higher maturities of Cetes) in the later period as compared to the

prior period, and significantly lower in most cases, indicating further that collusion between banks existed before April 19, 2017 and stopped or lessened after the COFECE investigation was announced.

**G.    Characteristics of the MGB Market Enable Collusion and Have Led to Past Collusion**

73.    The MGB market is dominated by just eight market maker banks, and there has only ever been a small group of market makers since the Bank of Mexico began the Market Maker Program in 2000.  The fact that only a small number of market makers dominate the MGB market makes collusion easier.

74.    MGB trading in the United States is a small sector in terms of the numbers of individuals involved as compared to other financial markets.  MGB traders often have close relationships with MGB traders at other banks, and the Defendants often hire MGB traders from other Defendants who retain close ties to their past colleagues.  The small network of closely linked MGB traders makes collusion easier.

75.    A 1993 analysis of Cetes auctions from 1986-1991 found evidence of collusion.

76.    A 2001 analysis of Cetes secondary market trading from 1996-2000 also found evidence of collusion.

77.    A few years ago, Defendants Bank of America and Barclays were fined by COFECE for their misconduct in the MGB market.

**H.    Defendants' Anticompetitive Actions Injured Plaintiff**

78.    Plaintiff is an American pension fund that purchased MGBs from the Defendants during the Class Period.

79.    Defendants' actions: (1) raised the price of newly issued MGBs to artificially high levels; and (2) increased the bid-ask spread for MGBs in secondary market transactions to

artificially wider levels, so that Plaintiff and other Class members paid artificially high prices to buy MGBs and received artificially low prices when selling MGBs.

80.    Plaintiff was thereby injured in each of its MGB transactions with Defendants during the Class Period.

81.    Plaintiff does not claim injury for Defendants' collusive bidding during MGB auctions.

## CLASS ACTION ALLEGATIONS

82.    Plaintiff brings this action on behalf of itself and as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, seeking monetary damages on behalf of the following class (the "Class"):

> All persons or entities who, between at least October 28, 2006 and April 18, 2017 (the "Class Period"), purchased a debt security issued by the Mexican government directly from any Defendant during the Class Period, or sold a debt security issued by the Mexican government directly to any Defendant during the Class Period, and during that transaction either the person or entity was domiciled in the United States or the transaction occurred in the United States.

> Excluded from the Class are Defendants and their employees, agents, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and all federal governmental entities.

83.    Plaintiff believes that there are at least thousands of members of the Class described above, making the Class so numerous and geographically dispersed that joinder of all members of the Class is impracticable.

84.    There are questions of law and fact common to each member of the Class that relate to the existence of the conspiracy alleged and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

a.   whether Defendants engaged in a combination or conspiracy to fix, raise, and/or otherwise manipulate the prices of newly issued MGBs sold to United States buyers in violation of the Sherman Antitrust Act;

b.   whether Defendants engaged in a combination or conspiracy to fix, raise, and/or otherwise manipulate the bid-ask spreads for their trading of MGBs in the United States market as market makers in violation of the Sherman Antitrust Act;

c.   the overall duration of the conspiracy;

d.   which Defendants were involved, and at what times;

e.   the nature and character of the acts performed by Defendants in furtherance of the conspiracy;

f.   whether the conduct of Defendants, as alleged in this Complaint, caused injury to Plaintiff and members of the Class;

g.   whether Defendants concealed the conspiracy's existence from Plaintiff and members of the Class;

h.   whether Defendants specifically intended to, and did in fact, manipulate prices of MGBs in the secondary market;

i.   whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole;

j.   the appropriate injunctive and equitable relief for the Class; and

k.   the appropriate measure of damages sustained by Plaintiff and members of the Class.

85.   During the Class Period, Plaintiff purchased MGBs from the Defendants and its interests are aligned with, and not antagonistic to, the interests of the other members of the Class. Plaintiff is a member of the Class, has claims that are typical of the claims of the other members of the Class, and will fairly and adequately protect the interests of the other members of the Class.   In addition, Plaintiff is represented by counsel competent and experienced in the prosecution of antitrust and other complex class action litigation.

86.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

87.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

88.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.   Moreover, prosecution of this litigation as a class action will eliminate the possibility of repetitious litigation.   Class treatment will also permit the adjudication of relatively small claims by many members of the Class who otherwise could not afford to litigate antitrust claims such as the ones asserted in this Complaint.   This litigation presents no difficulties of management that would preclude its maintenance as a class action.

### EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

89.     The statute of limitations applicable herein was tolled on grounds of fraudulent concealment, both due to the deliberate efforts of Defendants to conceal their conduct, and the types of conduct that are self-concealing.

90.     Defendants' conspiracy relied on private communications – instant messages, telephone calls, emails, and meetings behind closed doors, which concealed from Plaintiff and the Class the Defendants' agreements to artificially raise the price of newly issued MGBs and increase bid-ask spreads for MGB trading.   These private means of communication prevented

Plaintiff from uncovering Defendants' unlawful conduct prior to the public announcements of the investigations into Defendants' conduct.

91.     Defendants also deliberately concealed their anticompetitive actions from Plaintiff and the Class, by failing to disclose: (1) that they were colluding in bond auctions (while this is not part of Plaintiff's claim, knowledge of that fact would have led Plaintiff and other reasonable investors in the Class to question Defendants' actions in the secondary MGB market as well); (2) that the sale prices of newly issued MGBs reflected collusion between Defendants to artificially raise the price; and (3) that the bid-ask spreads Defendants offered for MGB trading in the United States market were artificially wide as a result of collusion between Defendants.

92.     Most, if not all, of these deliberate actions could not reasonably have been detected by Plaintiff and other members of the Class.  Defendants' price-fixing was self-concealing and could not reasonably have been detected by Plaintiff or other members of the Class.  The bids that Defendants submitted in auctions are confidential and not accessible to the public.  This allowed Defendants to keep their conspiracy hidden for years.  Likewise, the Market Maker Program required Defendants to compete fairly when bidding in auctions and when offering MGB transactions to investors.  Plaintiff could reasonably assume that the Defendants were following the rules of the Market Maker Program, and that Defendants were being monitored by Mexican regulators to watch for any violations thereof.

93.     Defendants distributed various promotional materials to United States investors in order to encourage them to invest in MGBs, such as BBVA's 2011 "Handbook of Mexican Financial Instruments."  Defendants' promotional materials failed to disclose their collusive actions.

94.     As a result, Plaintiff and the Class were not aware of Defendants' anticompetitive actions prior to the announcement of the COFECE investigation, and could not reasonably have become aware of them through due diligence.   Plaintiff therefore asserts that the applicable statute of limitations for its claim is tolled, and that Defendants are equitably estopped from claiming that the statute of limitations has run with respect to the Class Period asserted herein.

## **CLAIM FOR RELIEF**

### **FIRST CAUSE OF ACTION**
**Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act**
**(Against All Defendants)**

95.     Plaintiff hereby restates and incorporates the preceding paragraphs as if fully set forth herein.

96.     Defendants entered into and engaged in a combination and conspiracy in an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1.

97.     During the Class Period, Defendants, who are the market makers in the MGB market and are horizontal competitors, conspired with one another to increase their profits by: (1) colluding to artificially inflate the price at which they sold newly issued MGBs to United States investors; and (2) colluding to artificially widen bid-ask spreads for MGB transactions with United States investors.

98.     Defendants' anticompetitive actions caused Plaintiff and other Class members to: (1) pay artificially high prices for newly issued MGBs that they purchased from Defendants; and (2) pay artificially high amounts to buy, or receive artificially low amounts when selling, MGBs in secondary market transactions with Defendants.

99.    Defendants' actions constitute a horizontal price-fixing conspiracy that is a *per se* violation of §1 of the Sherman Act.  Alternatively, Defendants' actions resulted in substantial anticompetitive effects in the market for MGBs in the United States.  Defendants' conspiracy to inflate the price of newly issued MGBs sold to United States investors, and to widen bid-ask spreads for MGB trading with United States investors, had no legitimate business justification and created no procompetitive benefits, nor did the overt acts taken by Defendants' personnel in furtherance of the conspiracy.  Any supposed procompetitive benefits are false and pretextual or could have been achieved in a less restrictive manner.

100.    As a direct, material, and proximate result of Defendants' violations of §1 of the Sherman Act, Plaintiff and the Class have suffered injury to their business and property, within the meaning of §4 of the Clayton Act throughout the Class Period.

101.    Plaintiff and the Class seek treble damages for Defendants' violations of §1 of the Sherman Act and under §4 of the Clayton Act.

102.    Plaintiff and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under §16 of the Clayton Act.

### **PRAYER FOR RELIEF**

Plaintiff demands relief as follows:

A.    That the Court certify this lawsuit as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be designated as class representative, and that Plaintiff's counsel be appointed as counsel for the Class;

B.    That the unlawful conduct alleged herein be adjudged and decreed to violate Section 1 of the Sherman Antitrust Act;

C.      That Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged herein;

D.      That the Court award Plaintiff and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled under Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15, plus prejudgment interest at the maximum rate allowable by law;

E.      That the Court award Plaintiff its costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law; and

F.      That the Court direct any such further relief that it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: May 17, 2018                          **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

                                                      s/ Christopher M. Burke
                                             CHRISTOPHER M. BURKE
                                             600 W. Broadway, Suite 3300
                                             San Diego, CA 92101
                                             Telephone: 619-233-4565
                                             Facsimile: 619-233-0508
                                             cburke@scott-scott.com

                                             **SCOTT+SCOTT ATTORNEYS AT LAW LLP**
                                             THOMAS K. BOARDMAN
                                             230 Park Avenue, 17th Floor
                                             New York, NY 10169
                                             Telephone: 212-519-0523
                                             Facsimile: 212-223-6334
                                             tboardman@scott-scott.com

**RADICE LAW FIRM, P.C.**
JOHN RADICE
DANIEL RUBENSTEIN
34 Sunset Blvd.
Long Beach, NJ 08008
Telephone: 646-245-8502
Facsimile:  609-385-0745
jradice@radicelawfirm.com
drubenstein@radicelawfirm.com

**SHEPHERD FINKELMAN
MILLER & SHAH, LLP**
ERIC. L. YOUNG
35 East State Street
Media, PA 19063
Telephone: 610-891-9880
Facsimile:  866- 300-7367
eyoung@sfmslaw.com

*Attorneys for Plaintiff*